Good afternoon, and let me call the case of Clemons v. the Commissioner. Good afternoon. May it please the Court? My name is Eric Bloom. I'm here on behalf of the Petitioner, Eugene Clemons. With the Court's indulgence, I'd like to first address briefly the equitable tolling issues, and then I would like to move on to the Atkins issue, which I think will require substantially more discussion. The doctrine of equitable tolling, as its name commands, is equitable in nature. The Supreme Court in Holland made it clear that the determination is to be made on a case-by-case basis. It eschewed absolute legal rules or archaic rigidity, emphasizing instead that the standard is flexible to address new fact patterns. In this case, we've made a submission of extraordinary circumstances on the basis of four different events, each of which implicates state conduct. I'd like to very quickly tick off those four events. First, that the court clerk erroneously told counsel that there was no filing fee, and that can be found at tab 2812. Let me ask you this question, counsel. Certainly. We have a prior decision, Smith v. Alabama, that's similar to this case. We said in Smith that the failure to pay a filing fee or to attach an informal properous motion to a Rule 32 petition in Alabama is garden variety negligence on the part of counsel, and that's not enough to constitute an extraordinary circumstance sufficient to support equitable tolling. How do we get around Smith v. Alabama? The state, in fact, at page 30 of its brief says that the Smith case is on all fours with this case. Let's juxtapose those cases. First, in that case, there was no allegation, much less evidence, that the clerk provided erroneous information regarding the filing fee. Second, in our case, not in the Smith case, the clerk actually stamped a stamp-and-return copy for those of us who used to practice in the old days before it was all electronically. Right, but that's of no legal consequence, even if the clerk thought he was doing it right. If the clerk had improvidently done that, so what? Well, if he says that it's filed, that's a representation, in this case, a false representation, inadvertent for sure, to counsel because it was never filed. Didn't it have to be properly filed? The difference between filed and properly filed? Filed is a term of art. This was never filed. It was never filed. As a matter of fact, rather than being received and filed, it was received and lost. It was stuck behind a filing cabinet for four months with a couple of other unrelated pleadings, and I don't think there's any question. Let me go to the basic question that Judge Wilson is suggesting by the reference to counsel. I'm not talking about a petitioner on his own relying on a statement from a clerk, but why would it be appropriate for an attorney or a sophisticated attorney to ask the clerk of court about filing fees and his obligations when all he had to do was look at Article 32 and the corollary references in Alabama law? It seems odd that you'd say to your secretary, figure out what the fee is. She comes in and says, I can't, and then you just call the clerk of court and say, what are my obligations? What's the fee amount? It strikes me that regardless of what a clerk says, and the clerk might have been a lawyer, might have been a person and not a lawyer, there was some obligation on the lawyer's part to read what appeared to me to be pretty self-evident from simply looking at Rule 32.6a, which says with clarity that the petition shall not may be accompanied by two copies. It shall be accompanied by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in form of paupers. If the petitioner desires to prosecute IFP, he shall file certain things among other things. It shall be accompanied by a certificate of award and et cetera. What was ambiguous about that? Why would it have been difficult for counsel to simply read 32.6 and discover that if you want to petition under 32.6, you got to do one of two things, either pay a filing fee or proceed IFP? Rule 32, of course, refers to the civil rules. The civil rules provides you what the specific fees are. There's nothing there specific to the habeas. There is a catch-all provision. So then the question is, is it under? Yeah, all you have to do is look at and I went to look and then the amount has changed depending on the year you look at it, but if you look at the section of the Alabama Code 12-1971, it says unambiguously the docket fee which shall be collected in the civil cases shall be A3, $140 for cases filed in the circuit court. Right, so no complexity there, is there? There's nothing that's specific to a habeas, your honor. So the question then is, wait a minute, wait a minute, but the rule 32 says it while it doesn't cite you to 12-1971, it says specifically that it shall be accompanied by a fee prescribed by law in civil cases in the circuit court. All you had to do was look up and see what was prescribed by law in civil cases in the circuit court and you would have seen it was $140. Maybe I'm missing something. I believe it's not unreasonable to read rule 32 as saying pay the fee parentheses if any. Where does it say if any? It doesn't, but I'm saying, and just follow this through if you will, you then take a look at the civil rule. The civil rule doesn't say anything specific about habeas. You then call the clerk, and I want to point this out because I think this is critical to our argument, so I don't want this to get lost. This isn't a case like Jackson where you're talking about deadlines. At the end of the day, this is an administrative task by the clerk. If you take a look at many of the circuit court's websites, it'll say you're welcome to call our offices and come by Jefferson County. Please contact the circuit clerk's office directly with any question on filing fees. Mobile says if you're unsure how to calculate your fees, please call this number. Nor do I want to get lost the fact that if you take a step out, this is the perfect storm because it's not contested. The district court accepted Mr. Christie's affidavit. So again, I want to come back to the strength of our argument is the totality of the circumstances. We may disagree about what is required by counsel. We obviously submit that it's not unreasonable to call the clerk's office, especially when various clerk's offices say, call us about the fees. Well, let's suppose that Mr. Christie was negligent in failing to submit a filing fee or an IFP or the IFP documentation. As I read the opinion in Cadet that was substituted on rehearing, it says that negligence by itself is not enough to constitute extraordinary circumstances. So my question is, assuming Mr. Christie was negligent, can you still prevail as far as extraordinary circumstances? Thank you for that question, Your Honor. That's exactly what I was getting to. Here's the totality of the circumstances. This was the perfect storm because I don't think anyone will disagree, and certainly the state hasn't, that under Alabama Code 12-1794, it is the clerk's statutory duty to keep all papers, books, dockets, and records belonging to their office with care and security so as to be of easy reference. Behind the filing cabinet does not satisfy that obligation. It was because our petition was stuck behind a filing cabinet that there was no notice of deficiency. Your Honor, Judge Wilson asked about the Smith case. In Smith, when you look at the differences, the clerk's office sent counsel in that case, and it's right there in the decision, advising that, quote, a filing fee of $154 or impoperous is required to file the petition. And then it asked counsel, quote, to please submit the filing fee and the application for ProHoc Vichy to our office at your earliest convenience so that we may get the petition filed. Also, when we're looking at all the facts and circumstances, let's also remember the Downs versus McNeil case, where this court mentioned in that case, notwithstanding all the issues, the petition was filed only eight days late. Here, the IFP that we were filing anyway was filed, for other purposes, was filed three days late. How do we know that the petition was the original petition, the one that was filed in December of 1999, was lost? How do we know it was lost? Because there isn't any affidavit or anything in the record about it. There's an affidavit from the clerk? No. There's an affidavit that's from local counsel, tab 2812. There was no evidentiary hearing on this issue. The district court accepted that sworn representation at footnote eight of that decision, saying the court does not question the reasons given by counsel for his failure to pay the filing fee at the time he filed the Rule 32 petition. With the court's indulgence, just looking at the clock, if you have no other questions on this, I'd like to for equitable tolling are cases that generally arise in the pro se context. That is to say, where a pro se petitioner is told the wrong thing by the clerk. The clerk says, file it here rather than there or there rather than here. File it within this time frame rather than that time frame. For very powerful reasons, the courts are going to say, the petitioner is not licensed to practice law and might have some reason to rely upon what a government authority, let alone a clerk of court, tells him. But we're in a different area when we're talking about a mistake by a lawyer. Has misinformation ever been used where the petitioner is counseled? I can't find a case that says that. Where there's ever been equitable tolling where the lawyer for the petitioner says, I got bad information from the clerk or something like that or from the court. Nor have I ever seen the opposite where because it's to a represented, to counsel. I don't doubt that there might be a case where misinformation to a lawyer might actually amount to enough. The problem that I have here, and if you can just in one line help me with understanding, as a general matter, the Supreme Court has spoken of abandonment, where basically the lawyer leaves his client high and dry. So we look and ask whether there was some extraordinary circumstance that you couldn't navigate around by due diligence. But it struck me, looking at 32C.6a and the statute, that it was very easy to navigate around anything the clerk may have told you that was erroneous. All you had to do is do a little bit of research. So how does this amount to an extraordinary circumstance, even if I accept the assertion that the misinformation cases which come up pro se ought to be applied where the petitioner is counseled? I think, again, there are several things. The very fact that even, let's assume that it's attorney error, Your Honor. Clearly there was an assist here by the state. Well, there's no doubt it's attorney error right there. Okay, so you have attorney error, and you also have an assist by the state. When you're looking at extraordinary circumstances, you have on the one side those cases that deal with attorney abandonment. You also have those cases that deal with state conduct. Here, there was misinformation. Take that as just a tiny piece of this. You also have the representation it was filed. You also have the representation, and I don't want this to be lost, that the petition was lost. I also don't want to have be lost the fact that in this case the clerk failed to provide the notice of deficiency. In Rule 32, 6A says if it's filed in the wrong form, you have to advise counsel. Their practice, I'm told, is they both call counsel up, and they send it in writing. None of that happened. If I may refer you to the Berger v. Scott case, the 10th Circuit case, which cites the Supreme Court case of Baldwin County. I'm quoting now. The Supreme Court has indicated that equitable tolling may be applied where a court has led a particular plaintiff to believe that she or he has done all that is required under the circumstances. Here, when you do what the clerk tells you, and you get that stamped copy that says it's filed, you file a month early, and you still don't get a notice of deficiency. We would have corrected it had we known. Let me ask you just one final question, then we'll move on to the other area. Suppose a lawyer calls the clerk, and the clerk says with respect to an IFP filing, it's enough if you file your IFP petition, you don't have to give me a certificate from the warden or an appropriate officer of the institution. I would say that's not enough because that's in the rule. Okay, thank you. And I think there's enough ambiguity in the civil rules governing the fees that it merits a phone call. That's the difference. Turning to the Atkins issue, focusing very importantly on 2254B2 in light of the Shoup case, we're relying on an unreasonable determination of fact. Here, there was an unreasonable determination. Just so that I'm clear on this, given what the Supreme Court said in Shoup, you agree you can't rely on more than anymore. We cannot rely on more. At least not the way you did. Correct. Otherwise, it's an interesting argument, it seems to me, that you make because there's no question the state court focused on one side of the ledger and only one side of the ledger. But that really, they were free to do that under the operative law at the time. At least that's what Shoup tells us. I think what Shoup tells us is you cannot rely on Moore's principle of law. There were cases before then and there were authorities before then that has made it clear we don't need more is the short answer. In fact, our first brief was done before Moore was even issued. So if I may run through why it's an unreasonable determination of fact. Three reasons. Number one- So your central argument goes off on the fact as opposed to contrary to an unreasonable application of the law. Correct, your honor. Okay, correct. Number one, because the state court itself found that Mr. Clemens' IQ was as low as 70. Two, because the only standardized adaptive functioning test administered to Mr. Clemens showed that he had six significant adaptive deficits and that wasn't contested by the state and was not even mentioned by the circuit court. And three, and critically, that this, rather than being an after-the-fact lawyer-made argument, clearly Mr. Clemens satisfies the third prong, that the condition manifested itself prior to the age of 18. Because we don't have to do a retrospective analysis or diagnosis here, he was actually diagnosed as mentally retarded when he was six years old. Taking them, the limited time we have, one at a time, the circuit court at EMC 657, page 18 of its decision, says when Clemens puts forth effort, he consistently scores in the 70 to 80 range on intelligence tests. These scores, the circuit court found, place him in the borderline range of intellectual functioning and established that he is not mentally retarded. What the court did is it said he might be mentally retarded and he might not, because obviously scores between 70 and 75 clearly fall within the range of mental retardation. How do we know that? What was before the court at the time? The AAMR 10th edition at page 58 defines significantly sub-average intellectual functioning as approximately 70 to 75, taking into account measurement error. It adds on the next page. This expands the operational definition of mental retardation to 75. The DSM says the same thing. Atkins at footnote five says the same thing. So we don't need more or any of those other cases for that. Do we have to defer to the state court's determination that with regard to the low scores, Clemens was malingering? What I try to do for purposes of this argument is to absolutely simplify this. So let's give Alabama the benefit of those doubts. There were seven test scores. Let's get rid of the three for purposes of this argument that they want to discard. That leaves you with the 73 on the waste that was pre-Atkins that everyone agrees he was not malingering for. Clearly falls within the range of mental retardation. Remember the Brumfield case, which was in fact a D2 case, very similar to that which is before your honors now. In Brumfield, the petitioner had a 75, and the Supreme Court said that falls squarely in a D2 case within the mental retardation or intellectual disability range. Is a court free to average amount? Or is it your view that it's unreasonable for a court to average out not seven scores? Let's just assume we discount three of them, the 51, the 67, and the 58. That leaves us with four. Leaves us with four. A score of 77, a score of 84, a score of 73, and a score of 77. Of that, only one falls beneath 75. Could a court not reasonably average them out and come out with a mean and say the mean is above 75? Would that be unreasonable for them to do? Well, the problem here is you have to knock out the 84, the beta 2. But that's a different question, and I'm happy to have you address that for me, but I'm asking you a very specific question. Was it unreasonable for the state trial court, or for that matter, the federal habeas court, to average out four scores and come up with a number that was 77 point whatever? Is it unreasonable to take a mean? We believe in this record. And if it is, what case would there be out there that would suggest that if you have multiple scores? Relying on more, not for the D1 principles, but for its fact finding, there was a score of a 74 and a 78. And the majority found on the basis of the 74 that he checked off that first prong in absence. So I would rely on that, Your Honor. But I want to go back to this other point, because if you knock out that 84, you're left still with a 75 point something. And we've already briefed quite extensively the issues with the beta test. That was the 84. That's only a screening. The Supreme Court in- Let me ask you, by the way, on that. Was that beta 2 score ever introduced by the state at the 2004? No, it's never introduced at the Atkins hearing. I raised it because it appears in the state court order. Exactly. But when I looked at the record, I didn't see- It's not there. It's not there. But your argument as to that is 84 is infirm for a different reason, because it was a beta score that was used. Well, number one, because it was not introduced- Well, I didn't think I read that state or anyone else who says that that beta 2 can be used to diagnose mental retardation. That's not in there. It's normed on the prison population. It was for illiterates in World War I. You take a look at cases like Pruitt v. Neal. I asked you to take a look at that K7 circuit. It found mental retardation and discarded the beta of a score of 93. The Allen v. Wilson test discarded the beta of 104. Rivera v. Dretke discarded the 85 and 92 and says all of the literature this court has reviewed suggests that one sacrifices accuracy for speed when one administers tests designed for screening purposes. And I see my time is up. You may finish the point. You go ahead. Thank you very much, Your Honor. In the Brumfield case, which was again a D2 case, reasonable, whether the diagnosis or the finding that the petitioner there was not mentally retarded, the Supreme Court said not only was there a 75, but it acknowledged that there was a screening test that had a higher score. And the Supreme Court says there was testimony at trial regarding the possibility that the state expert obtained an IQ score over 75, but the testimony was that Dr. Jordan only did a screening test, while the petitioner's expert gave a standardized measure of intellectual functioning. And then the Supreme Court said that screening score was not sufficiently rigorous and it would not rely on that. Again, that's a D2 case. So if you knock out that score, you've got a 73, what I would call two soft 77s that I'd be happy to discuss now or later as Your Honors see most appropriate. What do we do with the fact when we're looking about whether the state trial court's application, the findings of fact were unreasonable? You have here, as best I can tell, seven mental health experts evaluate Clemens in his adult years. Five of them perform IQ tests. And of the five, four, all but golden, opine that Clemens was not intellectually disabled. Only one says that he was, four say he wasn't. And the one who says he was is obviously discredited for a variety of reasons by the state trial court. What would be unreasonable about that determination by the state trial court? Where you have four of five who say he was simply not mentally disabled. We disagree with Golden's assessment. And the trial judge who sees and hears Golden says, I got a bunch of problems with what Golden did. I don't like the way he jiggered the scores on one test. And here are some other problems. Why was it unreasonable? Which is the ultimate question. And you've got the burden for the trial court to conclude that he was not mentally disabled, at least if you were looking at the raw scores themselves. So there are two answers, Your Honor. The first is there are only two experts. The state's expert, Dr. King, Mr. Clemens' expert, Dr. Golden, who testified for purposes of determining mental retardation or intellectual disability. That's it. Two of the other experts were talking and testified regarding brain damage. Then you've got certain experts, Grant Berger, Hazel Rigg, and Rivenbark, where they weren't examining mental retardation. They didn't testify at the Atkins hearing. They were looking to determine whether or not he understood his Miranda rights. They were looking to see whether or not he satisfied the competency to stand trial. And there's case law out there that says looking at one is not sufficient to look at the other. Then the other issue that Your Honor raises, if I may briefly address, is the so-called credibility determination. Miller, L. versus Cockrell, Supreme Court 2003 decision, which we include in our briefs, says, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. And it goes on to say a federal court can disagree with the state's court's credibility determination and conclude that the decision was unreasonable. What was the basis here for the credibility determination? The court noted that Dr. Golden only testifies on behalf of criminal defendants and never on behalf of prosecutors. Now, remember, of course, this was a proposed order that the judge assigned. But if you look at his testimony- But even if you accept the idea that Golden was competent and qualified and rendered an opinion that he was mentally disabled, you had a number of others on the other side of the equation who said, no, we disagree. Why couldn't the trial court opt for those who said no rather than the who said yes without yielding a result that was unreasonable? Because the court doesn't have to be blind as to the basis of anybody's testimony. And in this case, Your Honor, if you go through the three prongs, you have the state court itself acknowledge that Mr. Clement's IQ could be as low as 70. You knock out that 84, you're at about a 75. That goes beyond any conclusory conclusions. Number two, you have the only test, the ABAS-2, which was administered by Dr. Golden, that the state never contested. That, in fact, their expert, when I read this court's decision in Letford, the 2016 case, their own expert used the ABAS-2. It's cited in there. That's probably the reason why Dr. King never challenged the ABAS-2. What are his supposed strengths? His supposed strengths is the fact that, one, you can engage in sexual relations, or two, the fact that he can lie. Anyone who's ever had a toddler knows that they lie, they just don't lie very well. And the third thing they pointed to is the fact that he can deliver pizzas, never mind that he could not, according to his boss, calculate change very well or find houses. And then the third prong, of course, is the fact that he was actually diagnosed when he was six years old as mentally retarded. So we've got the underlying facts. The fact that someone spouts something, that doesn't mean that we don't look at the underlying facts, Your Honor. Let me ask you a slightly different question, and you're on our time, not yours. Thank you. You've reserved your full seven minutes. I appreciate it. It's sort of an antecedent question on the prong two of 2254D. What's the proper standard we use? We've never answered the question, nor has the Supreme Court under D-2 or under E-1. Is the standard unreasonable determination of the facts, or is the standard, the one stated in E-1, where it says the applicant shall have the burden of rebutting the presumption of correctness by clearing convincing evidence, does it matter here? Well, I don't know that it matters, but I do believe that D-2 is the applicable standard, at least until this circuit reconvenes en banc. We don't have to reconvene en banc to decide that question. We've never decided the question. This Court has the power to decide it. But in Jones v. Walker, which was en banc, and it's cited to and quoted from in this Court's Cave v. Secretary for Department of Corrections, says, and again, this is a quote from the en banc decision, when a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, which is the D-2 standard, this Court is not bound to defer to unreasonably found facts or to the legal conclusions that flow from them. Right. But trust me when I tell you it's an open question. It's an open question here as well as in the Supreme Court. Does it matter to your argument whether the standard is unreasonable determination of the facts as opposed to rebutting the presumption by clear and convincing evidence? We believe... Can you meet either standard? We do believe that we can meet the higher standard, Your Honor, given the fact that Brumfield has specifically said a 75 falls squarely, the Supreme Court's word, within the range of intellectual disability. When the only standardized test for purposes of determining adaptive functioning says that Mr. Clements is deficient in six out of ten categories, the AAMR, and I think this also gets lost, this is all before the circuit court. In the AAMR at page 83, the association says adaptive behavior should be measured with a standardized instrument that provides normative data on people without mental retardation. That's the ABAS-2. That was done here. That's the test that Dr. King relied on. What year was that test administered? I believe 2003, Your Honor. But that is the only test, and that's the test I said Dr. King actually used in the Lether case. It's published by the Psychological Corporation. This is at EMC 917 to 921. The same people who developed the Wechsler, the WAIS, it's the only one standardized specifically for the purpose on a normal population at looking at the DSM-IV criteria. How can we close our eyes to that? I will ask you to bring your remarks to a conclusion if you want to reserve the seven minutes. I'll step down, and I'll reserve the remainder. Thank you, Your Honor. Thank you. Thank you, Your Honors, and may it please the Court, Edmund LaCour here on behalf of respondents. Since we were having a lot of discussion about the Atkins issue, I'll start there, and I'll be happy to end with equitable polling after I've addressed all your questions on Atkins points. A few points just to respond right away to some of the things my friend on the other side was saying. Brumfield doesn't really apply here, Your Honor. That was a case where the Louisiana State Court completely denied a hearing on the Atkins issue, concluding that a 75 alone was enough to prove that there was not even a reasonable doubt about whether or not Mr. Brumfield could meet the Atkins prong one standard or any of the Atkins prongs for that matter. That's not what happened here. We had a four-day hearing, Your Honor. While one of the scores was a 73, there's no precedent from this Court or any Court that says that you have to credit the one lowest score, and moreover, you have to credit the bottom of standard error of measurement, and not to failure to do so is somehow unreasonable from the State Court. Rather, this Court said in Ledford that the standard error of measurement is not a one-way ratchet, and you do not have to assume that someone's IQ is going to be found at the bottom of that stem rather than somewhere near the top. And when there are multiple other scores that suggest that the actual IQ is somewhere higher and outside of that range, it is completely reasonable for the State Court to conclude that a petitioner has not met the first prong of Atkins. And that's what we have here, Your Honors. We have four scores that fall. Have we or any other Court ever adopted the notion that you can come up with a mean figure by adding them all up, dividing by four, three, or seven? I believe this Court has stated, and in some cases I don't have the citation with me right now, Your Honor, where an average has been applied in some way. But even if you don't average it, it would be perfectly consistent and perfectly reasonable for the Court to say that he has 277s that were handed down decades apart, which shows remarkable consistency that he is someone who is in borderline intelligence range. You have the 84 as well. I'd like to address some of the points that were made. How do we know that the State Court ever even considered the four low scores at all? The three low scores, Your Honor? They were addressed in the State Court's decision. Moreover, and this actually relates both to the Beta 2 test that my friend was discussing, as well as the score of the 51 that was discredited. Both of those were included in what we refer to as the Buttner Report. It was a report put together by Drs. Hazelrig and Drs. Berger, who worked at the Federal Facility in Buttner, North Carolina, and who assessed Mr. Clemens after he was arrested for the murder of Douglas Althaus. In there, they noted that he had scored this 84 on the Beta 2 test in 1991, and then they tried to administer the Weschler Adult Intelligence Scale revised the ways are to him in November. I'm having a hard time figuring out how the Court could even factor the Beta 2 score into consideration if it was never even introduced into evidence. And that's what I was about to address, Your Honor. If you look at 1759, that is the Buttner Report. The Buttner Report is Petitioner's Exhibit 8. It was the petitioners, Mr. Clemens, who introduced the Buttner Report into evidence. The Buttner Report is what included the Ways-R score of 51, and would also mention the Beta 2 score of 84. So, they do say in the brief that the State never introduced the Beta 2 score. Well, we didn't need to. They had already introduced it. So, your answer is it was produced and made part of the record evidence before the State trial court in the Buttner Report itself. That's exactly right, Your Honor. And, Your Honor, they rely on the score of the 51 in their brief when they're trying to calculate averages. They think that the 51 is good enough to mention in their brief. The 84 is also good enough for this Court to consider and was good enough for the State Court to consider. If they were going to introduce the Buttner Report that had both of those scores in it, they've got to take the bidder with a sweet, or they have to explain why the bidder should not have been given some credibility. They failed to do that. They did not say, here's the Buttner Report. And, by the way, the Beta 2, don't give it much credence. You should really discount that, but this 51 is somehow something that you should take as gospel. So, Your Honor, I think that's really an issue. It's really hard to understand how the court took all of these scores into consideration when it adopted the State's proposed order verbatim, including typographical errors and misspellings. Your Honor, the court had four days of hearings, dozens of hours of testimony, thousands of pages submitted into the record. Federal and State courts every day adopt proposed orders. They ask for a proposed order from Mr. Clements and a proposed order from the State, and at the end of the day, adopted the proposed order. There's nothing unfair about that. And, moreover, this court has said federal courts are not in the business of checking the State court's homework. And, quite honestly, I think those sorts of arguments made by petitioners are inconsistent with those principles, Your Honor. So, there's nothing in there that was inaccurate. They note this Beta 2 issue, but as I just explained, that is really a non-issue, Your Honor. That was in the record. It was something the State court could consider. And that fact finding that they made is entitled to deference unless shown that it is objectively unreasonable. And, by clear and convincing evidence, we would submit as well, Judge Marcus. But, I would also say we think that we win under either the D2 standard or D2 plus E1 because Mr. Clements... It's the right standard in the view of the State of Alabama. We believe the right standard is the clear and convincing evidence standard in E1. It's somewhat hard to see what E1 would do in this context if it didn't apply to an issue like this. So, we do think that that is the better of the arguments. But, again, I don't think... So, you don't think we have to answer the question here? I don't believe so, Your Honor. Again, four days of hearings, as you pointed out, seven different experts looked at Mr. Clements. Only one found him to be intellectually disabled. And there were severe credibility problems with his testimony. For example, the Stanford-Binet test, which he gave in October 2003, returned a score of 58. Now, the problem, typically, I think if an expert gets a low score for a client who is having an Atkins hearing, that's somewhat good news. But here, the problem was that just a couple years prior, Clements' other expert, Dr. Ackerson, had administered the Ways R test to him in November of 2000, again, before Atkins was decided. She returned a score of 73. If you look at her test results, it says borderline written beside every single score. Borderline, of course, is above intellectually disabled. So, that 58 that he returned on Stanford-Binet was an entire standard deviation lower than what Clements' other expert had found just a couple years prior. So, he proceeded to manipulate the numbers, if you will, and he said, well, we should really add three points across the board to make this a 61. And then he said, but I think that's a quote, overcorrection, close quote. So, he manipulated the numbers some more, and to fix the overcorrection, he ended up adding five more points. So, you'd think if he was fixing overcorrection, the number would go down, not go up five more. And that's why the state court, at the end of the day, found that the reasons he gave were, quote, incredible, close quote, and were given in an effort to make the score appear more consistent with Clements' other In short, in trying to make the Stanford-Binet test results look more credible, he squandered his credibility. So, it was not just because he had mostly done work for defendants that the state court found him to be incredible. It's also because of what he said before the state court. Thus, when you get to the ABAS-2 test that he administered later, as the district court recognized… Well, how's his credibility affected by the fact that Clements was diagnosed as being mentally retarded at the age of six? I'd like to address that, Yaron. So, the score he received was a 77. That was from the school psychologist. If you look back at the reports, it says recommendations, medical recommendations, and it says special classes or EMR in one of those instances. In holding back in first grade or EMR special classes. So, it's not even clear that EMR was meant to be sort of a clinical diagnosis as much as it was perhaps a recommendation. Right. But the language they use is educably mentally retarded, right? Yes, Your Honor. And I think that they may have been shorthand for special classes. There was no indication he actually was placed in those classes at that time, but rather was held back. But, Your Honor, despite the fact that we have one diagnosis there, even granting them the fact that that may have been considered a diagnosis, we have multiple other diagnoses, including the 77 that that same practitioner gave him. And my friends on the other side take issue with 77, the reliability of that test because Clements was only six and a half at the time. But there is expert testimony from Dr. King that scores are stable, can be stable between six and eight. Moreover, that they are more low scores. And he said a 77 is particularly low, which means there's even more reason to think that this was a stable score. And then its stability is further demonstrated by the 77 that he got more than 20 years later when he was administered the WAVE-3 by Dr. King, as well as the 73 that he received from Dr. Ackerson and 84 he received on the Beta-2. So, I don't think that creates any problems for us, Your Honor. When there's conflicting evidence and the state court reasonably goes one way instead of the other, I mean, that is the exact sort of case where EDPA is supposed to kick in. I think what else I need to respond to from my friend. Yeah, I mean, he mentioned this was a case of two experts, Dr. King and Dr. Golden. However, only Dr. King's testimony really lined up with all the record evidence from those other experts. Again, many of whom said explicitly that he is borderline. Drs. Hazelrigg and Drs. Berger, who evaluated him in 1992 in the federal facility, said that he is likely borderline, unlikely mentally retarded. Dr. Rivenbark, in 1994, concluded that Clemens was probably in the mid-70s to mid-80s when it came to his IQ. That's from the clerk's record on direct appeal 1309 through 10. And in addition to that, it's hard to imagine clear evidence in the lingering from him on these tests where he scored quite low. For example, when Dr. King assessed him before Atkins was decided, he was active. He scored a 77. Afterwards, on the Ways, he scored a 60. There are some questions on the Ways and the Ways 3 that were quite similar, including in 2001, he was asked to define the term winter. He said cold time of the year, which was full credit. In 2004, when asked to define winter, he said fall, which is no credit whatsoever. In 2001, he knew his social security number. He knew the date. In 2004, he said he didn't know either of those things. So it was, frankly, it would have been unreasonable for the state court to conclude that he was not malingering in instances like that. But the court did go along with, again, this long history of malingering from the time he killed Doug Althaus until all the way up until 2004, which more than supports the court's finding that the expert testimony coming from the state was more credible than the testimony from the other side. Your Honor, briefly to address some of the evidence in favor of, well, I also need to address the ABS-2 results. Now, it's true this is the only test of adaptive behavior. I believe it may have been the only test of adaptive behavior that was handed down that it was quantified at the end of the day. But there's no clear Supreme Court precedent that says that a test of adaptive behavior that ends up with a number is somehow the gold standard or superior to more qualitative assessments of adaptive behavior. But what's interesting about the trial court's analysis of adaptive functioning is he looks at, by my count, five factors. Employment history, the ability to have interpersonal relationships, being involved extensively in criminal activity, post-crime craftiness, and being able to use his adaptive functioning was not so limited as to fall into a mentally disabled category. They don't quarrel with those findings by the trial court. They simply say, there's other materials in the record that cuts the other way. And what the trial court did was simply examine one side of the ledger and not the other, that there was other evidence of limitations in the ability to function. And he didn't say word one about any of that. How do we handle that? Was the judge free, first of all, as a matter of law at the time? Again, this is before Hall, before Moore. We just have Atkins. And we have to look at what was clearly established at the time by the Supreme Court of the United States. Was the trial court free, the Rule 32 court free, simply to look at the positive side of the ledger and not the negative side? Maybe he looked at both sides. All he talked about was the positive side. Yeah, I'll add two points on that, Your Honor. I'd say first, I think he was free if that was how he wanted to proceed. There was nothing clearly established. As you noted, Atkins was the only clearly established federal law at the time. It was state court law, though, that he was bound by. That had come from the Supreme Court of Alabama. What did that teach at the time? And those are cited in his order where he cites to Perkins and he cites to one or two other decisions where those were the sorts of factors, the five factors you just mentioned. Those were the sorts of factors that Alabama courts had been looking to when looking at adaptive behavior. So it was perfectly reasonable and not contrary to clearly established federal law at the time for him to do that. And he found that quite reasonably that Mr. Clemens satisfied or when assessing those five factors. But there's certainly something odd about an explication of the facts that simply says, here's the plus side, even though what I'm looking at is trying to determine limitations in adaptive functioning. And yet I don't cite a single thing that bore on limitations. Second point about that, Your Honor, this court has said, including in the Lee decision, that's 726F31172, that's back from 2013, that when you have a final finding or final conclusion from a state court and that final demands that any implicit findings bound up in that ultimate conclusion should be implied and are entitled to the same sort of deference that an explicit finding would be entitled to. Thus, when Judge Kugler here looked at what the state court had done, he said, well, obviously, what he did was he implicitly rejected the credibility of these ABS2 results. And there is a question that I think is related to Judge Marcus's question. Is the state's answer that Judge Kugler was entitled to completely disregard deficits in adaptive behavior at all? I think there are two answers, Your Honor, the state court, not Judge Kugler, but Judge Kugler was doing the right thing and reviewing the state court's decision. Judge Kugler was the district court. Either court, the state court or the Judge Kugler. One, I think the state court would be entitled to do that. But two, I don't think this court can, from this record, can say that that is what the court did, rather what this court... What did the state court say about deficits in adaptive behavior? He said that he failed to satisfy the second prong of Atkins. And as long as there's any evidence whatsoever to support that... Did the state court mention any of the, I think there were six deficits that were identified. The state court had identified... They were not mentioned explicitly, but as the district court noted, the implicit finding was that you just could not credit Dr. Golden, particularly after what he had done earlier with the Stanford-Binet test. But I'd be happy to address a couple of the other reasons why it's quite reasonable for this court to conclude that there was implicit rejection of the ABS-2 results. You mean beyond discrediting Golden? Beyond just discrediting Golden writ large. So, for example, he scored a 1. So, a 10 is average on this test. He scored a 1 on goal-directed behavior. That's as low as you can get. Now, Dr. Golden was then being cross-examined, and he admitted that the way he carried out this crime by planning, acquiring a gun ahead of the time, getting his friends to drive around until he spotted the Camaro and decided he really wanted to get this Camaro, that showed goal-directed behavior, which, again, would be inconsistent with someone who scored a 1 on the ABS-2. Moreover, he scored a 1 on work, an absolute bottom of the metric 1. But his work history showed that he had held several different jobs, maybe not for very long, but he was employed at Domino's on two different occasions. He lost the job the first time because he wrecked his car, but the same manager hired him back a second time after his grandfather purchased him a car. This isn't someone who had a 1, and there's no reason why you have to score a 1 just because it shows up on a piece of paper as a 1. It's not – it's only as good as the inputs. None of this is in the decision, though, right? In the state court's decision, none of you – No, Your Honor, and if this is on direct appeal, this might be a tougher case for us, but this is AEDPA, and this court has said you imply the findings that need to be there to support the ultimate conclusion. You can summarily decide – okay, he could have summarily written this off and said, denied, not Atkins, and that's okay under AEDPA as long as there are facts in the record that support that. As well, he scored a 1 on social skills, and again, as low as you can get, but the record showed he had multiple relationships with women, including one that was described as serious. He fathered multiple children. This is not someone who would show up with a 1 on the ABS-2. The condition is not that the court disregarded deficits in adaptive behavior. It took those deficits into consideration, but you have to imply that from reading the state court's decision. I think that's a perfectly reasonable way to resolve this issue, Your Honor, and that absolutely, I think, commanded by this court's precedent as well. So, Your Honor, the other issues here. So, if you will, I'll turn briefly to the equitable tolling issue. So – Can Alabama – can an Alabama state court waive the requirement of a filing fee or an informal paupers motion? I'm not aware that that is possible, Your Honor, and again, I don't think it would be reasonable for an attorney to conclude that that's what was happening here. What if counsel for Mr. Clemons arrived with his petition in December of 1999, checkbook in hand, and he writes out the check for the filing fee, and the clerk says, put your checkbook away, counsel, you don't need it. You don't need a filing fee. Your Honor, I'm still thinking – Would that amount to an extraordinary circumstance sufficient to support equitable tolling? I don't think it would, Your Honor, but I also don't think that's the circumstances we have here, and I'll address that in a second. First, I don't think that would meet the extraordinary circumstances for the reasons that you were all discussing earlier. This is – How do we know what happened if there was no evidentiary here? That's another great point, Your Honor. It was their burden to show this. They submitted a threadbare affidavit from Mr. Christie. Again, they had the burden on them to show that there were these extraordinary circumstances, that there was this unavoidable obstacle, and the evidence – You don't dispute the facts in Mr. Christie's affidavit, the facts pertaining to what the state clerk did, right? I don't dispute that. I haven't called the clerk myself to try to figure out what really happened, but – And the state didn't put in any evidence contrary to that evidence, right? Correct, Your Honor, but I'd like to draw you to what Mr. Christie's affidavit does not say. So, I don't actually think whatever happened with the clerk – And I'll note, too, if you look at Docket Entry 28-10, page 8, and Mr. Christie sort of sets the scene that day. It's December 23rd. He was, quote, very busy trying to get out of the office to go on Christmas vacation with his family, close quote. He calls the clerk when they're having trouble determining what the fee is. He doesn't even say what the exact words are. He just said, I came with the understanding that no fee was going to be required. So, I said, go ahead and file this without a fee. What he never says, though, is that he was told, counsel, you can file a Rule 32 petition with no fee or with no IFP motion. It may – it very well may have been. So, based on that alone, what the clerk's office told him was literally true. He did not need to file a fee to get his Rule 32 petition on file. He could have filed an IFP motion. Indeed, that's exactly what he did a little over a month later. It just happened to come in three days too late. So, I don't believe he was misled. There certainly isn't enough evidence in there to suggest that he was misled when you could read that testimony one way or the other, and the burden is on them to show extraordinary circumstances and an unavoidable burden. But, Jaron, there's another point I'd like to make. The fact that the second filing came through on January 28th also shows that there was no unavoidable obstacle, but not only because they actually were able to file this, but for additional reasons. Going back through the reply brief, and was a little surprised when I saw that… But what if everything in his petition was true, that he arrived at the clerk's office, that he was told you don't need either one of those things? Excellent. What if all those things were true? First of all, there is no evidence that he was told he did not need an IFP motion, and that is crucial. I think that's fatal to their claim. But even if we assume, contrary to the evidence, and again, it's their duty to put the evidence into record, even if we assume he was told, on December 23rd, no Rule 32 needed, or with your Rule 32, no filing fee needed, no IFP motion needed, they still knew that there was a problem with that initial filing before the one-year statute could run. And we know this from two places in the record, Your Honor. Reply brief, page 8, Clemens says that they filed the second Rule 32 petition, again, the one that included the IFP motion, to preempt any argument, quote, that the original petition failed to satisfy any formalistic requirements, close quote. So, and they mailed that in on January 24th. The one-year ran on January 25th. So they knew there might be formalistic deficiencies, or at least an argument as to formalistic deficiencies on January 24th, and had they walked it down to the Shelby County Courthouse. Because maybe that's because they checked and it was, and the petition was lost, and they wanted to make sure that it was filed. Exactly, Your Honor. And that brings us directly into the Sandvik decision from this court in 1999, where you had a counsel who was trying to file a habeas petition. He had seven days to go. He dropped it in the mail from Atlanta to Miami. It showed up a day late. Yeah, but there's a big difference between that case and this one, in that there was not a timely filed petition that did not meet the requirements of the law. In other words, when he filed that petition, had he accompanied that petition on December the 27th of 1999 with a filing fee, it would have been properly filed, right? Correct. Okay. Well, you don't have an improperly filed petition in the case that you just cited, right? Sandvik was, that's correct. But the point is, once they knew on January 24th or earlier that they didn't have something proper on file, then you're squarely within Sandvik. Just like Sandvik, they need to get something on file, and they hadn't yet. But if the petition is lost, that's not the attorney's fault. That's the court clerk's fault. Right. But we're still looking at whether the circumstances were unavoidable or not, Your Honor. And this claiming was avoidable. I'd point you as well, docket entry 28-10, page 15. Timothy Broas, lawyer from Winston and Strawn, said, as soon as we realized we had a problem, we did file the IFP. And I can't see how you have a clear instance. This is a clear instance of excuse and neglect at that point, because they knew, at least after January 24th, when they dropped the second petition in the mail, that they had a problem. How do we know all of this without an evidentiary hearing? This is what he said to the court. I think you can take counsel's representation to the court as evidence of what happened.  They never got an update from the court. They don't even know who they spoke to at the clerk's office, Your Honor. And again, that's not the clerk's fault. Honestly, this is why we have attorneys who have rules and Westlaw and have a phone. That's another way this is not unavoidable, Your Honor. And this is why it defers from pro se instances. They still had 29 days to fix this problem. They could have called a couple of times and said, is this on file yet? That would have fixed it. Moreover, if you look at this case, this court's recent decision in Johnson, that's 738 Federal Appendix 1003. I mean, that was an instance where one of the factors this court considered was why the petitioner waited so long in the first place to try to file the Rule 32 petition. So there was no evidence as to why he needed to wait 264 days to even try to start tolling his one-year statute of limitations. Well, counsel here, he was convicted in 1994 and 25 years ago now. His conviction did not become final until 1999 on January 26th. So that's all that time where they could have started thinking, what are we going to put in our Rule 32? And then they waited another 336 days before they filed that Rule 32 petition. That's not on the clerk, Your Honor. That's on counsel. It's another reason why the clerk's office did not do anything that made this unavoidable. So there's no affirmative misrepresentation on the part of the clerk about whether or not a IFP motion is required. All we have in the affidavit, Your Honor, is the court is, Christie's saying, I was told no filing fee was required, which again is true if an IFP motion is included. All we have to base all this on as well as his hurried conversation as he was trying to get out of town. But if he was told this is properly filed. He was not. That's another excellent point, Your Honor. If you look at Jackson v. Estru, that's a case from this court, 2007, that's 506 F. 3rd, 1349. A petitioner tried to make a similar argument. She filed her petition in the wrong court. The court accepted it. She said, well, I was misled because the court accepted this, even though it didn't belong there. And this court said, that's not misleading. In this case, the petition was stamped as received and filed, right? I presume that was the case in Jackson as well. Clerks tend to use stamps. And I don't see how this is really any different. It's misleading for a court to stamp. If I were to file a complaint tomorrow, just a two-page piece of paper on PACER, it's going to show up with a stamp and that's later going to be rejected. So when an attorney files a petition in an Alabama court and the clerk tells him that it is received and filed, the attorney is not, he doesn't have to rely on that representation? Your Honor, when it says that the clerk, I'll read you 32A. It says the clerk, upon receipt of the petition and the filing fee, or an order granting leave to proceed IFP, the clerk shall file. But only upon receipt of the fee or the IFP motion. So if he'd read the rule, he would have known, yes, it technically has been received, but the clerk will not file it until... What if I'm aware of the rule, but the clerk says, don't worry about it, it's filed. That's not an extraordinary circumstance. That's not sufficient to constitute an extraordinary circumstance. One, I don't believe it is sufficient because, again, we're dealing with attorneys here, Your Honor. Two, that's not what the record shows here. The record only shows... What is the law from the Supreme Court of the United States that if an application is erroneously accepted by the clerk of court without the requisite filing fee, it's not properly filed? Didn't the Supreme Court of the United States say that unambiguously in Artoos v. Bennett? Yes, Your Honor. And again, counsel should... Isn't that the answer? Yes, Your Honor. Did the Supreme Court say in Artoos v. Bennett that an affirmative misrepresentation on the part of the clerk will not excuse an improper filing? There was no affirmative misrepresentation by the clerk in Artoos v. Bennett, was there? Not that I'm aware of, Your Honor. And I don't believe there's an affirmative misrepresentation here as to the first point. And second, they had a second chance to get this right. It was January 24th. They knew they hadn't got it right. And so you can almost wipe the slate clean before. And all they need to do is drive 45 minutes south to the Shelby County Courthouse and drop it off. That would have done it. Instead, they dropped it in the mail just like the lawyer in Sandvik did. It showed up a little too late. That's sort of ordinary mistake that has never constituted extraordinary circumstances. And for that reason, we believe the equitable tolling finding by the district court should be affirmed. And this court should deny the petition. Thank you, counsel. Mr. Bloom, you've reserved seven minutes. Thank you, Your Honor. So much to say, so little time. First, with respect to the appropriate deference that should be afforded to the state court decision. There's a fine line between deference and abdication of judicial review. And I would refer you to your sister court decision, Pruitt v. Neal, 788 F. 3rd, 248, Seventh Circuit. Deference applies, quote, only to those issues the state court explicitly addressed, end quote. I had begun when I was up here initially to talk about the credibility determinations. I had mentioned that the circuit court adopting the state's proposed order found that Dr. Golden testifies only on behalf of criminal defendants and never on behalf of prosecutors. That proposed order omitted the following Q&A. This is at EMC 1002, directed to Dr. Golden. Why have you never testified for the government? In each of the cases in which I worked with the government, they settled out of court. They reached a plea bargain. So let me go back now. I'm sorry? In implicit findings of deficits and adaptive behavior, we can look in spaces, we can look and find implicit findings. Tell me what you say about that again. The AAMR specifically says at page 8 and at page 83 that that ought to be determined by the administration of an objective standardized test normed on a normal population. That's what we did. The problem here is the court looking at these so-called strengths, and these are not strengths. None of those purported strengths is inconsistent with a diagnosis of mental retardation. Not one. But there is zero analysis as to the subject's, the defendant's weaknesses. Zero. And you cannot close your eyes, the circuit court cannot close its eyes to really principle, evidentiary submission made by Clemens' counsel. Let's also now turn to when Mr. Clemens was six years old. The psychologist who evaluated him says, among other things, he works very slowly, gives up easily, no alpha recognition, little math concept, seems to be making little, if any, progress in both reading and math, has great difficulty in the use of written language, will just sit and do nothing. Work is done very slowly, takes excessive time, and does not complete anything. That's at EMC 170609 and 1712. There was no malingering happening when he was all of six years old. Dr. King admitted in testimony that he was diagnosed as educably mentally retarded, which he also agrees, very explicitly, is synonymous with the term mild mental retardation. And that can be found at EMC, that much I've got. Now, I'm not finding it. Let me ask you a question this way, since you're focusing on that score at six and a half. Is it unreasonable for the state court to credit the score from that date, given its consistency with Clemens' later scores? Yes. Why? Unreasonable is different from saying, if I were the trier of fact, I might not have done it. Unreasonable means that no reasonable jurist under these circumstances could have done what he did. I understand. Why was that unreasonable, particularly in light of the testimony of Dr. King, who was asked at length about this IQ at the age of six, and whether it was sufficiently stable and predictable? And he says, there's kind of a transition, in my opinion. And from understanding the literature, we start sometimes administering intelligence tests as young as two and a half. Usually, it's pretty well settled by six to eight. And he chose to give it credit. He, King, as an expert, and there was no dispute that he was otherwise competent by background and training to opine in the field, couldn't the court reach the determination that it did, that it could credit this score to, without falling across the ocean into the abyss of unreasonableness? I think it is in the abyss, Your Honor. Let me explain why. First, by the way, I found this site. It's 1583 and 1602, where Dr. King is asked that Mr. Clements was classified as educably mentally retarded when he was in first grade. He says, yes, and you agree, don't you, that educably mentally retarded is equivalent to mild mental retardation? Yes, those terms are equivalent. Now to the last question, Your Honor. So let's take a look at the testimony. First, Dr. Golden explains that IQ doesn't stabilize until ages 10 to 12. That's at EMC 922. Right, but there's a disagreement about that. King says quite the opposite. King says, quote, it is pretty well set by six to eight. Golden says, no, it's set at 10 to 12. Okay, so three different points. I couldn't credit King and discredit Golden, which he obviously did. So there are three different points. First, what is not contested is Dr. Golden's explanation, and that's at 755, goes on 30 pages, explaining that part of the brain doesn't even begin to develop until age six. Second, to your very specific point, Your Honor, what is Dr. King's precise testimony? He's asked and he says, as you just said, it starts to be stable. That's his words. It's usually pretty well set by six to eight. So his testimony is that it will be set within that range. He does not exclude the possibility that at six, it's not going to migrate down. And when you take a look at Dr. Golden's explication at EMC 755, that the tertiary part of the brain doesn't even begin to develop, it explains why 77 at the age of six is not the final word. Most importantly, Your Honor, and this is beyond critical. What does Atkins teach us? And if you can just bring it to a conclusion, we've gone way, way over the time. Thank you. What does Atkins teach us? It's that the determination has to be consistent and informed with the medical community standards. The clinician at the time who administered the test, who had all of the data, some of which I just read, that clinician found that was a soft 77, that that 77 was not inconsistent with the diagnosis of mental retardation. So you have, in this instance, something you don't have in most of the death cases that come before Your Honors. You've got a real-time contemporaneous diagnosis of mental retardation 25 years before Atkins was ever issued. The ABAS-2 supports that. The circuit court's determination that his IQ is as low as 70 is also not inconsistent with the determination that Mr. Clemens is mentally retarded. Thank you very much for your time. Thank you very much. Thank you all for your efforts. This court will be in recess. All rise.